IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELA GLIKIN,                           *

                                   *

         **Plaintiff,**          *

                                   *     **Civ. No.: MJM-21-3251**

    **v.**                           *

                                   *

**MAJOR ENERGY ELECTRIC**     *

**SERVICES, LLC,**              *

                                 *

         **Defendant.**       *

                                 *

        * * * * * * * * * *

**MEMORANDUM OPINION**

Angela Glikin ("Plaintiff") brings this putative class action against Major Energy Electric Services, LLC ("Major" or "Defendant"), alleging breach of contract and unjust enrichment. This matter is before the Court on Defendant's Renewed Motion to Dismiss the Amended Complaint, or in the Alternative, Motion to Strike Plaintiff's Amended Complaint. ECF 93. The motion is fully briefed, and the Court heard oral argument on October 7, 2025. For the reasons stated herein, Defendant's motion is GRANTED IN PART and DENIED IN PART.

I.     **FACTUAL BACKGROUND**[1]

In 1999, Maryland enacted the Electric Customer Choice and Competition Act, which deregulated the utilities market and allowed customers to purchase their electricity from licensed independent energy service companies ("ESCOs"). Am. Compl. ¶ 41. Defendant is one such ESCO and acts as a "middleman" between the energy producer and the end-user customer, buying energy and reselling it to customers. *Id.* ¶¶ 1, 42. There is no difference in the electricity that ESCOs

---

[1] The facts outlined herein are drawn from Plaintiff's Amended Complaint. *See* ECF 73.

1

provide compared with state-regulated utility companies; the only difference is price. *Id.* ¶ 6. Plaintiff alleges that a local utility company's rates, like Baltimore Gas and Electric Company's ("BGE"), "serves as an ideal indicator of market conditions" for the supply of electricity. *Id.* ¶¶ 85, 100.

In 2013, Plaintiff enrolled with Entrust Energy ("Entrust"), an ESCO, to receive electricity at a fixed rate of 9.5¢ per kWh (kilowatt-hour). *Id.* ¶ 82; ECF 73-1. Her agreement with Entrust provided that the plan would eventually go from a fixed rate to a month-to-month variable rate unless she responded to a notice sent 45 days before the change went into effect. Am. Compl. ¶ 83; ECF 73-1. The variable rate was calculated as follows: "The rate per kWh may be adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors." Am. Compl. ¶ 84; ECF 73-1. Plaintiff alleges, on information and belief, that this provision was the same for all of Defendant's customers. Am. Compl. ¶ 84.

In May 2016, Plaintiff received a letter, informing her that Entrust had assigned her electricity supply contract to National Gas and Electric ("NGE").[2] *Id.* ¶ 86; ECF 73-2. In March 2018, Plaintiff received another letter, informing her that NGE would soon assign her electricity supply contract to Defendant. Am. Compl. ¶ 87; ECF 73-3. The letter explained that Defendant would honor Plaintiff's prior agreement with NGE and that the variable rate calculation would remain the same. Am. Compl. ¶¶ 88–90. In addition, the March 2018 letter stated, "The Major

---

[2] In the May 2016 letter, NGE asserted in bold print that it would "honor [Plaintiff's] current agreement with Entrust" and that there would be "no changes to the terms and conditions[.]." ECF 73-2. However, the next paragraph informs the consumer that if they are billed under Entrust's variable rate, their "service would continue under [*NGE's*] variable electricity rate." *Id.* (emphasis added).

Energy team's experience in deregulated energy markets enables them to offer competitive prices

. . . ." ECF 73-3. Plaintiff's contract with NGE was assigned to Defendant in April 2018.[3] *Id.* ¶ 91.

Plaintiff alleges that Defendant, despite providing assurances that it would provide

competitive prices, immediately began to "price gouge" her. *Id.* ¶¶ 89–91, 93. In January 2020,

Plaintiff realized her electric utility rates with Defendant were significantly higher than what BGE,

her local utility, was charging, and she cancelled her service with Defendant. *Id.* ¶ 92. For the 21

months that Defendant supplied electricity to Plaintiff, its rates were on average 151% higher than

BGE's rates. *Id.* ¶¶ 97–98. Plaintiff argues that a reasonable customer would interpret the statement

regarding competitive prices to refer to the market rate and that the rates Defendant charged could

not possibly be described as competitive. *Id.* ¶¶ 94–96, 99.

Not only were Defendant's rates consistently higher than BGE's, but they were also higher

than those of other ESCOs. *Id.* ¶¶ 111–16. Of the 54 ESCOs that operated in Maryland in 2018,

Defendant's rates were the second highest. *Id.* ¶ 113. Defendant's rates were higher than the

average rates of its competitor ESCOs every year in Maryland from 2002 through 2019. *Id.* ¶ 112.

Defendant's rates also rarely reflected the wholesale market price of electricity; even when the

supply costs of electricity decreased, Defendant's rates would frequently increase. *Id.* ¶¶ 118–21,

135. Plaintiff contends that Defendant's conduct contradicted what a reasonable customer would

have expected from an electricity supplier that promised competitive prices. ¶¶ 117, 122–23, 136.

According to the Amended Complaint, Plaintiff and other customers were induced to buy

their energy supply services by Defendant's representation that its prices would be competitive

and would reflect market conditions. *Id.* ¶ 131. Defendant knew it could charge exorbitant rates

---

[3] The parties do not dispute that NGE used the same method as Entrust to calculate variable rates. They presume that NGE, like Entrust, was obligated to set rates that "reflect market conditions" and that Defendant was similarly bound by its assignment. *See* ECF 93-1 at 7–8; ECF 97 at 7, 15.

3

because customers would not know such rates were out of line with Defendant's competitors. *Id.* ¶¶ 132–34. According to Plaintiff, no interpretation of the phrase "market conditions" could explain or justify the rates that Defendant charged for supplying electricity. *Id.* ¶¶ 140–45. Thus, Plaintiff alleges, no reasonable customer with adequate knowledge of Defendant's rates relative to the market would have chosen to contract with Defendant. *Id.* ¶¶ 139, 142.

Plaintiff sues on behalf of a putative class of Defendant's customers for Defendant's "standardized and uniform" conduct. *Id.* ¶¶ 146–47. The class consists of multi-state and state-specific subclasses. *Id.* ¶ 148.

## II.    PROCEDURAL HISTORY

On January 14, 2021, plaintiff Angela Glikin filed her initial Complaint against Major Energy Electric Services, LLC, in the United States District Court for the Southern District of New York, asserting claims for breach of contract and various unfair and deceptive practices in violation of state law. ECF 1. The case was transferred to this District on December 12, 2021. ECF 42. On October 17, 2023, Plaintiff filed an Amended Complaint, narrowing her claims to breach of contract (Count I) and unjust enrichment (Count II). ECF 73. (Am. Compl.).

Defendant moved to dismiss, arguing that Plaintiff failed to exhaust administrative remedies by not first presenting her claims to the Maryland Public Service Commission ("PSC"). ECF 78-1 at 10–11. Plaintiff opposed, contending that the PSC lacked primary jurisdiction because it cannot provide a comprehensive remedy for breach of contract and unjust enrichment claims. The Court agreed that the PSC had primary jurisdiction over claims asserted in the Amended Complaint and ordered a stay, thus giving Plaintiff an opportunity to present her claims to the PSC. ECF 86.

Plaintiff filed a formal complaint with the PSC on November 6, 2024, asserting the same breach of contract and unjust enrichment claims. *See* ECF 93-1 at 10; ECF 92-2. On February 28, 2025, Major filed a motion to dismiss or, in the alternative, an answer to Glikin's PSC complaint. *See* ECF 93-4. On May 19, 2025, the PSC dismissed Plaintiff's claims for failure to state a claim. ECF 93-3 ("PSC Decision"). Specifically, the PSC concluded that "it was not, at the time in question, unlawful (under either the [Public Utility Article] or [applicable regulations]) to charge a price significantly higher than that offered by other retail suppliers or utility standard offer service." PSC Decision at 7. The PSC also concluded that Defendant's "statements describing its prices as 'competitive' did not violate the prohibitions on fraudulent or deceptive practices contained in the PUA or COMAR." *Id.* The PSC thus dismissed Plaintiff's administrative complaint for failing to state a claim upon which relief can be granted.

Following the PSC's decision, Plaintiff moved to lift the stay on June 16, 2025. ECF 89. Defendant did not oppose. ECF 90. The Court lifted the stay on July 21, 2025, and ordered Defendant to respond to the Amended Complaint by August 4, 2025. ECF 92. Defendant timely filed a Motion to Dismiss or, in the Alternative, to Strike. ECF 93. Plaintiff opposed on September 2, 2025 (ECF 97), and Defendant replied (ECF 100). The Court heard oral argument via videoconference on October 7, 2025.

### III.     MOTION TO DISMISS

Defendant moves to dismiss Plaintiff's Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. For reasons explained below, this motion is granted as to Plaintiff's claim for unjust enrichment and any claim for contractual breach founded upon the welcome letter Defendant issued in March 2018. The motion is denied

as to Plaintiff's remaining claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

### A. Standard of Review

A motion to dismiss under Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering a motion to dismiss, a court takes the factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert denied*, 566 U.S. 937 (2012).

Although on a motion to dismiss the Court is generally limited to the facts as alleged in the Complaint, the court may consider "documents that are explicitly incorporated into the complaint by reference," and "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs.*

6

*Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) and Fed. R. Civ. P. 10(c)).

### B. Discussion

#### 1. Breach of Contract

Defendant argues that Plaintiff's breach of contract claim should be dismissed because the allegations do not state a plausible claim for relief.

To state a claim for breach of contract under Maryland law, "a plaintiff must allege sufficient factual content for a court to infer that (a) the defendant was under a contractual obligation owed to the plaintiff, which (b) the defendant breached." *John v. Essentia Ins. Co.*, 708 F. Supp. 3d 694, 699 (D. Md. 2023).[4] The parties agree that they entered into a valid contract and that Defendant could only adjust the variable rate "to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors." Am. Compl. ¶ 84; ECF 73-1. The disagreement here is whether Plaintiff's allegations regarding Defendant's variable pricing support a plausible claim that Defendant breached those terms.

Maryland follows "the objective theory of contract interpretation[.]" *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 262 (4th Cir. 2024). As the Supreme Court of Maryland has explained:

> Maryland courts follow the objective theory of contract interpretation. Under that approach, unless the language of the contract is ambiguous, we interpret it based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation. Therefore, it is the written language embodying the terms of an agreement that will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.

---

[4] The assigned Entrust contract here contains a choice-of-law provision stating that any claims arising out of the contract are governed by Maryland law, and the parties do not dispute that Maryland law applies. *See* ECF 73-1 at 4.

> We do not, however, interpret contractual language in a vacuum. Instead, we interpret that language in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution. Although providing relevant context may necessarily require consultation of evidence beyond the four corners of the contract itself, it does not extend to extrinsic or parol evidence of the parties' subjective intent, such as evidence of the parties' negotiations. Such evidence may be considered only after a court first determines that the relevant contract language is ambiguous, which occurs when, viewing the plain language in its full context, a reasonably prudent person could ascribe more than one reasonable meaning to it.
>
> In interpreting the plain language of a contract in context, we attempt to construe the contract as a whole, interpreting separate provisions harmoniously, so that, if possible, all of them may be given effect. Construing the contract as a whole requires that effect be given to each clause to avoid an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.
>
> It is a bedrock principle of contract interpretation in Maryland that our courts consistently strive to interpret contracts in accordance with common sense.

*Lyles v. Santander Consumer USA Inc.*, 347 A.3d 449, 456 (Md. 2025) (citation omitted).

If a contractual provision is ambiguous, its construction will generally become "a factual determination that precludes dismissal on a motion for failure to state a claim." *1899 Holdings, LLC v. 1899 Liab. Co.*, 568 F. App'x 219, 224 (4th Cir. 2014) (quoting *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992). Ultimately, as a general matter, "ambiguities are resolved against the draftsman of the instrument." *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1078 (Md. 2010) (citation omitted); *see also HESS Constr. + Eng'g Servs., Inc. v. Francis O. Day Co.*, 332 A.3d 609, 625 (Md. App. Ct. 2025).

Plaintiff alleges Defendant breached because Defendant's rates did not "reflect market conditions." *See, e.g.*, Am. Compl. ¶¶ 13, 15, 84, 161, 163. Defendant argues that Plaintiff merely disagrees with the rates charged, which cannot amount to a breach—especially because the contract allowed Defendant to consider "profit" and "other market price factors" when setting the variable rate. *See* ECF 93-1 at 17. At this stage, Plaintiff has the better argument.

Drawing all reasonable inferences in Plaintiff's favor, the Complaint alleges a plausible breach of contractual obligations owed to Plaintiff. Although "market conditions" is not a defined term, Plaintiff contends that a reasonable consumer would expect Defendant's variable rate to reflect typical market factors such as supply, demand, competition, and transaction costs. *See Market: What It Means in Economics, Types, and Common Features*, INVESTOPEDIA (updated Apr. 5, 2025) (explaining that in a market economy, "factors like investments and the production, distribution, and pricing of goods and services are led by supply and demand from businesses and individuals"), https://perma.cc/XUH5-LAY7; *cf. Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019) (reversing dismissal where ESCO promised rates based partly on supply costs, and Plaintiff alleged wholesale energy costs fell while ESCO rates rose). This expectation is also plausibly supported by contract language referencing "market pricing of commodity" and "profit," implying supply-side costs should influence the variable rate.

Plaintiff supports her claim with facts showing that Defendant's rates: (1) did not track wholesale market supply costs and even increased when market prices fell; (2) averaged 151% higher than BGE's rates; and (3) exceeded rates charged by 53 of the 54 ESCOs operating in Maryland in 2018. Taken as true, these facts support Plaintiff's assertion that Defendant's pricing did not reflect market conditions. If rates rise contrary to wholesale supply costs and, at the same time, consistently exceed competitors' rates by wide margins, one may reasonably infer that the

rates were set based on factors other than typical market forces and that Defendant failed to adhere to its contractual commitment to align rates with market conditions. The disparity between Defendant's variable rates and market conditions, as alleged in the Amended Complaint, indicates a plausible breach.

Defendant's reliance on *Martinez v. Agway Energy Servs.*, LLC, 88 F.4th 401, 412 (2d Cir. 2023) is misplaced. There, Agway, a middleman ESCO like Defendant here, charged a variable rate "to be determined at Agway's discretion" that would reflect "the cost of electricity acquired by Agway from all sources …, related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins." *Martinez*, 88 F.4th at 407–08. The Second Circuit affirmed the district court's grant of summary judgment to Agway, holding that Agway "did not promise that its price-setting discretion would be limited to its procurement costs" and noting that Agway pointed to several factors that "can explain the differences between Agway's rates and the cost of obtaining electricity from the default utility during the relevant period." *Id.* at 412.[5] *Martinez* is inapt because the Amended Complaint here discloses no market-based explanations for Defendant's allegedly excessive rates. In Defendant's motion to dismiss, unlike on summary judgment, the Court must confine its analysis to the allegations in the Complaint, accept those allegations as true, and draw all reasonable inferences in Plaintiff's failure. Upon doing so, the Court can find no market-based justification for Defendant's rates.[6]

---

[5] In this respect, the *Martinez* court differentiated its case from *Mirkin*, where the ESCO defendant "failed […] to cast doubt on the plausibility of the Mirkins' allegations by explaining the 'substantial deviations' between its rates and the Market Supply Cost." *Id.* at 412 (quoting *Mirkin*, 931 F.3d at 177) (cleaned up).

[6] Although the plaintiffs in *Martinez* lost at the summary judgment stage (which was upheld), they survived Agway's motion to dismiss. *See Gonzales v. Agway Energy Servs., LLC*, No. 518CV235MADATB, 2018 WL 5118509 (N.D.N.Y. Oct. 22, 2018), and *Martinez v. Agway Energy Servs.,*

Defendant's argument that its ability to consider "profit" and "other market price factors" precludes Plaintiff's claim also misses the mark. While the contract permits Defendant to factor profit and market price into setting its variable rate, this right is not unlimited. A reasonable construction of the contract supports the conclusion that an exclusive focus on maximizing profit—without adequately considering relevant market factors such as the "market pricing of commodity"—would breach the contractual obligation to set rates that "reflect market conditions." The phrase "market conditions" implies consideration of objective market realities, including supply costs, rather than rates set mainly to maximize profit margins. Therefore, the inclusion of "profit" and "other market price factors" among the "market conditions" that affect adjustment of variable rates does not shield Defendant from claims that its rates exceeded the limits the contract set on Defendant's price-setting discretion.

### 2. Welcome Letter

The parties also dispute whether the Defendant's March 2018 welcome letter contractually obligated Defendant to offer "competitive prices." Plaintiff's complaint alleges that Defendant's March 2018 welcome letter, which stated that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices," is part of the parties' agreement and that "Defendant failed to perform its obligations under the contract, because its rates did not reflect market conditions *and were not competitive*." Am. Compl. ¶¶ 161, 163

---

*LLC*, No. 518CV00235MADATB, 2022 WL 306437 (N.D.N.Y. Feb. 2, 2022), *aff'd*, 88 F.4th 401 (2d Cir. 2023). The only case Defendant cites in its opposition where a court granted an ESCO's motion to dismiss on similar facts is *Nieves v. Just Energy N.Y. Corp.*, No. 17-cv-561, 2020 WL 6803056, at *1 (W.D.N.Y. Nov. 19, 2020). But *Nieves* is distinguishable because (1) the contract at issue in that case explicitly stated that the variable rate "will be determined by [ESCO-defendant] according to business and market conditions" without more and (2) the plaintiff complained that the defendant breached the implied covenant of good faith without any support, such as what the defendant's wholesale costs were or what competitors charged. *See id.* at *5. Similarly, in *Brown v. Agway Energy Servs., LLC*, 822 F. App'x 100, 102 (3d Cir. 2020), dismissal was upheld where the contract expressly gave the ESCO discretion to set the variable rate and warned there was "no limit on how much the variable rate can change from one billing cycle to the next." The contractual language at issue in the instant case does not accord Defendant such discretion.

(emphasis added). To the extent Plaintiff's Amended Complaint alleges Defendant committed an independent breach by failing to provide "competitive prices," that claim is dismissed.

As discussed above, to state a plausible claim for a contractual breach, Plaintiff must plead that Defendant owed her a contractual obligation and that Defendant breached that obligation. Any claim of breach premised on the welcome letter falters on the first step.

Plaintiff's theory appears to be as follows: Entrust's agreement with Plaintiff included "The Customer Disclosure Label and these Terms of Service, your Welcome Letter, and any Renewal Notice," ECF 73-1 at 3; Defendant was later assigned Entrust's agreement with Plaintiff; Defendant then sent its own welcome letter; Defendant's welcome letter stated that its experience "enables them to offer competitive prices"; thus, the parties' contract expressly incorporates Defendant's welcome letter into the parties' agreement, "such that any representations or promises made in it are part of the contract," ECF 97 at 27.

Plaintiff's theory fails for multiple reasons. "Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Turner Constr. Co. v. BFPE Int'l, Inc.*, Civ. No. JKB-15-368, 2016 WL 1169938, at *9 (D. Md. Mar. 25, 2016) (applying Maryland law) (citation omitted). The original agreement's reference to "your Welcome Letter" refers to the contemporaneous welcome letter sent by Entrust—not Defendant's welcome letter sent years later.

As a general rule, an assignee steps into the shoes of the assignor and assumes the same rights and obligations. *See Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296, 301 (Md. 2021). Defendant, as assignee, was not free to unilaterally to alter the terms of the original agreement by issuing a new welcome letter purporting to change or add to the contract's terms.

Finally, even if Defendant's March 2018 welcome letter were somehow incorporated into the agreement, Plaintiff would still fail to state a claim based on the welcome letter. A vague statement that Defendant's experience "enables them to offer competitive prices" is not an enforceable promise. *See Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 663 (Md. 2003) ("A promise is [] illusory when its indefinite nature defies legal enforcement.") (cleaned up) (internal citation omitted). The statement here does not objectively commit Defendant to charge any specific rate, nor does it define what "competitive" means in a way that could create a binding obligation.

In sum, insofar as Plaintiff alleges that Defendant committed a separate breach by failing to provide "competitive prices" within the meaning of Defendant's welcome letter, that claim is dismissed.

### 3. Implied Covenant of Good Faith and Fair Dealing.

In addition, the parties dispute whether Plaintiff plausibly alleges that Defendant violated its implied covenant of good faith and fair dealing.

"Maryland contract law generally implies an obligation to act in good faith and deal fairly with the other party or parties to a contract." *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009) (citing *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008)). That obligation governs the way a party may exercise discretion accorded to it by the terms of an agreement. *See id.* (citations omitted); *see also* 23 Williston on Contracts § 63:22 (4th ed.) ("A breach of the implied obligation of good faith and fair dealing is obviously present where a party acts in bad faith, but it may also be found where the defendant acts in a commercially unreasonable manner while exercising some discretionary power under the contract.").[7] The Supreme Court of Maryland

---

[7] *But see* 23 Williston on Contracts § 63:22 (4th ed.) ("As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract *expressly* permits the

has explained that "a contracting party acts in bad faith when doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *WSC/2005 LLC v. Trio Ventures Assocs.*, 190 A.3d 255, 268 (Md. 2018).

Plaintiff pleads, in the alternative, that "to the extent Defendant had discretion to set the variable rate for energy based on energy market pricing … Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge[.]" Am. Compl. ¶¶ 167–70. As discussed above, Plaintiff alleges a plausible contractual obligation that Defendant would set its prices in a way that reflects objective market conditions. Thus, "by failing to actually do this in practice, [Defendant] possibly denied [Plaintiff] what [she] reasonably expected to receive under the contract." *Richards v. Direct Energy Servs., LLC*, 120 F. Supp. 3d 148, 163 (D. Conn. 2015).[8]

Defendant's arguments for dismissal miss the mark. Defendant first argues that the duty of good faith and fair dealing "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." ECF 93 at 29 (quoting *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 265 (4th Cir. 2024)). Based on this proposition, Defendant argues that Plaintiff has not alleged how Defendant's pricing practices impeded her ability to perform her own contractual obligations. But Defendant overlooks that the

---

actions being challenged, and the defendant acts in accordance with the express terms of the contract.") (emphasis added).

[8] Although the plaintiff in *Richards* stated a plausible claim, the Second Circuit affirmed the district court's grant of summary judgment in favor of the ESCO defendant. *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 106 (2d Cir. 2019). Regarding the plaintiff's allegation that the ESCO defendant did not exercise its pricing discretion in good faith, the Second Circuit noted that the plaintiff produced no evidence, such as a comparison of the defendant's rates to its competitors, that defendant acted in bad faith. *Id.* at 98–100. Moreover, the plaintiff's complaint "focuse[d] exclusively" on the defendant's pricing practices in 2014 and 2015, even though the plaintiff had switched services in 2013. *Id.* at 100.

Fourth Circuit in *Kim* also recognized that "the implied duty of good faith and fair dealing mandates that a party refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *Kim*, 116 F.4th at 266 n.15. The court further noted that this broader formulation applies specifically when a party exercises discretion granted by the contract. *Id.* (collecting Maryland cases). Thus, Defendant is incorrect to suggest that Plaintiff must allege that Defendant's conduct prevented her from performing her contractual obligations (e.g., making payment) to state a claim for breach of the implied covenant.  It is sufficient for Plaintiff to allege that Defendant exercised its contractual discretion in an unreasonable way that frustrated Plaintiff's right to receive the contract's expected bargain. *See Richards*, 120 F. Supp. 3d at 164 ("While the contract left the price open to be set at [defendant's] discretion, the covenant of good faith and fair dealing requires that [defendant] exercise that discretion reasonably by charging a commercially reasonable price.").[9]

Defendant next argues that Plaintiff's allegation of a breach of the implied duty of good faith fails as a matter of law because "the 'bad faith pricing practices' identified in the Amended Complaint have been assessed by the PSC, and the PSC has concluded that [Defendant's] conduct was lawful." ECF 93 at 30. Defendant misunderstands the import of the PSC's decision. The PSC concluded Plaintiff's complaint before that body did not establish a violation of the Maryland Public Utilities Article ("PUA") or Code of Maryland Regulations ("COMAR") based on Defendant charging "a price significantly higher than that offered by other retail suppliers or utility standard offer service." ECF 93-3 at 7. But the PSC's finding that Defendant's conduct was not

---

[9] In its reply brief, Defendant cites to *Sommer v. CleanChoice Energy, Inc.*, No. 24-cv-11844, 2025 WL 2607994, at *3 (D. Mass. Sep. 9, 2025), and mistakenly suggests it is a decision of this Court. *See* ECF 100 at 5–6 (citing the case as "D. Md."); *see also id.* at 14. That case was decided by the U.S. District Court for the District of Massachusetts under Massachusetts law; it is neither a decision of this Court nor a decision made under Maryland law.

unlawful under PUA or COMAR would not preclude a finding that the broader range of conduct by Defendant alleged in the Amended Complaint before this Court breached the implied covenant of good faith and fair dealing. *See, e.g.*, *Suburban Mort. Assocs., Inc. v. Exel Props., Ltd.*, 176 F.3d 476 (4th Cir. 1999) ("This duty of good faith and fair dealing prohibits a party from acting arbitrarily, unreasonably, and in bad faith."); *Medex v. McCabe*, 811 A.2d 297, 306 (Md. 2002) ("The issue is not whether a party acted fraudulently; fraud is certainly inconsistent with the notion of 'bona fide' or 'good faith,' but it is not required to establish an absence of good faith."). Here, drawing reasonable inferences in Plaintiff's favor, she states a plausible claim that, even if the contract gave Defendant discretion to set the variable rate, Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge. The PSC's decision does not compel dismissal.[10]

### 4. Unjust Enrichment

Plaintiff asserts a claim for unjust enrichment in Count II of her Amended Complaint.

Under Maryland law, a claim of unjust enrichment requires that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew or appreciated the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying for it. *See Hebbeler v. First Mariner Bank*, Civ. No. ELH-17-3641, 2020 WL 1033586, at *23 (D. Md. Mar. 2, 2020) (collecting cases). However, such a claim is barred where an express contract governs the subject matter of the dispute. *Id.* (citing *Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. 2008)).

---

[10] Defendant's argument that Plaintiff failed to zealously pursue her claim before the PSC is also unpersuasive. Plaintiff brought the PSC the same claims she presented to this Court. The PSC exercised its independent judgment that Plaintiff did not state a claim the PSC was empowered to adjudicate. Whether Plaintiff states plausible claims for breach of contract and implied covenant of good faith and fair dealing is a different matter. This Court find that she does.

Here, Plaintiff alleges that Defendant "unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members [by] failing to supply Plaintiff and Class Members with the energy supply with the attributes for which they contracted." Am. Compl. ¶ 174. Thus, Plaintiff claims it "would be unjust and inequitable for Defendant to retain the payments Plaintiff and Class Members made for excessive energy charges." *Id.* ¶ 175.

Plaintiff fails to state a plausible claim for unjust enrichment. As Defendant argues in its motion to dismiss, the parties' dispute is governed by an express contract between the parties, precluding a claim for unjust enrichment. *See* ECF 93 at 30–31. Plaintiff does not address this argument in her opposition. *See* ECF 97. The Court may treat this silence as a concession that the unjust enrichment claim fails. *See Wheelabrator Baltimore, L.P. v. Mayor & City Council of Baltimore*, 449 F. Supp. 3d 549, 566–67 (D. Md. 2020) ("In failing to respond to this allegation, the Court concludes that Plaintiffs concede this point."); *Muhammad v. Maryland*, Civ. No. ELH-11-3761, 2012 WL 987309, at *1 n.3 (D. Md. Mar. 20, 2012) ("[B]y failing to respond to an argument made in a motion to dismiss, a plaintiff abandons his or her claim."); *see also* ECF 100 (Def. Reply). Accordingly, Plaintiff's claim for unjust enrichment shall be dismissed.

## IV.    MOTION TO STRIKE

In the alternative to wholesale dismissal of the Amended Complaint, Defendant argues that the Court should strike Paragraphs 18–25, 33–37, 39–40, 54–76, and 79–80 from the Amended Complaint. ECF 93 at 33. Specifically, Defendant argues that the Amended Complaint "contains allegations that lack any connection with the contract terms and pricing practices on which [Plaintiff's] claims against [Defendant] are premised and, instead, concern regulatory proceedings

17

in other states and matters not concerning [Defendant]'s conduct in Maryland." *Id.* at 32. The Court shall grant Defendant's motion to strike in part and deny it in part.

### A. Standard of Review

Rule 12(f) of the Federal Rules of Civil Procedure permits a court to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Courts have "wide discretion" in deciding such motions. *Peeples v. Lorring Park Apartments, LLC*, Civ. No. GLS 22-2218, 2024 WL 4932417, at *2 (D. Md. Dec. 2, 2024) (citation omitted). However, motions to strike are "generally viewed with disfavor." *Jacobs v. Nissan N. Am., Inc.*, Civ. No. GLR-22-2437, 2024 WL 3090139, at *3 (D. Md. June 20, 2024) (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001)). Courts typically grant such motions only when the allegations have "no possible or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to a party." *Gilman & Bedigian, LLC v. Sackett*, 337 F.R.D. 113, 117 (D. Md. 2020).

### B. Paragraphs 18 through 25

Paragraphs 18 through 25 of the Amended Complaint primarily reference litigation brought by the Illinois and New York Attorneys General against Defendant in 2018 and 2022, each of which allegedly resulted in settlements. On the surface, these actions—focused on allegations of fraudulent marketing—may seem unrelated to Plaintiff's breach of contract claim. But Plaintiff also alleges breach of the implied covenant of good faith and fair dealing. Defendant's broader business practices in other states could be relevant to that claim. *See Shields v. Prince George's Cnty.*, Civ. No. GJH-15-1736, 2016 WL 4581327, at *9 (D. Md. Sept. 1, 2016) ("[Defendant's] activities in a variety of states can be, and in this case are, relevant to the issue of custom and policy here."). Additionally, the challenged allegations support Plaintiff's contention that

18

Defendant's supply costs match those of the local utility, *see* Am. Compl. ¶ 24 (citing the New York Attorney General's findings), a fact relevant to Plaintiff's breach of contract claim. The Court declines to strike Paragraphs 18 through 25.

### C.  Paragraphs 33 through 37

Paragraphs 33 through 37 discuss administrative findings in Illinois and Maryland that led to civil penalties for deceptive marketing practices, including failure to disclose how variable rates would be applied. Defendant argues these allegations are irrelevant and will "unfairly" require a response. ECF 93 at 33. Although these administrative findings largely concern marketing practices rather than compliance with contract terms, it would be improper for the Court to weigh the evidentiary value of the administrative findings at this stage. Moreover, the findings relate to the same product and arguably touch on Plaintiff's theory of liability—i.e., unlawful conduct motivated by profit—so it is not clear that they are non-relevant. The Court declines to strike Paragraphs 33 through 37.

### D.  Paragraphs 39 and 40

Paragraphs 39 through 40 concern regulatory investigations and enforcement actions involving Spark Holdco (Defendant's parent company) and its subsidiaries in jurisdictions like Ohio. Because none of the allegations directly involve Defendant, striking Paragraphs 39 and 40 as impertinent and immaterial is justified.

### E.  Paragraphs 54 through 76

Paragraphs 54 through 76 present a broad narrative about deregulation, focusing on New York regulators' criticism of deceptive practices in that state's energy markets. *See* Am. Compl. ¶¶ 60–76. Most of the allegations address market failures in New York, widespread deceptive business practices, and administrative findings that are not directly tied to Defendant. Plaintiff

characterizes this section as "industry background" (ECF 97 at 36), but that justification falls short for two reasons. First, Paragraphs 41 through 53 already provide industry context, rendering another section to serve the same purpose redundant. Second, the challenged paragraphs focus on New York's market and regulations, which are immaterial to Plaintiff's claims. Accordingly, Paragraphs 54 through 76 shall be stricken as redundant and immaterial.

### F.  Paragraphs 79 and 80

Paragraphs 79 and 80 allege that (1) a Massachusetts publication reported consumers paid more after switching to ESCOs, based on the Attorney General's findings, and (2) Illinois enacted a law requiring ESCOs to include utility comparison pricing in marketing. Neither allegation is related to Plaintiff's claims. As such, these paragraphs are properly stricken as immaterial.

In sum, Paragraphs 39, 40, 54 through 76, and 79 through 80 of the Amended Complaint shall be stricken.

### V.    ORDER

For the foregoing reasons, Defendant's Renewed Motion to Dismiss or, in the Alternative, Motion to Strike (ECF 93) is GRANTED IN PART and DENIED IN PART. The motion to dismiss is granted as to any breach of contract claim based on a breach of Defendant's welcome letter, which is dismissed with prejudice. The motion to dismiss is granted as to Plaintiff's unjust enrichment claim, which is dismissed without prejudice. The alternative motion to strike is granted as to Paragraphs 39, 40, 54–76, 79, and 80 of the Amended Complaint, which are stricken. In all other respects, the motion is denied. A separate Order will issue.

  3/31/26                                                /S/
Date                                      Matthew J. Maddox
                                          United States District Judge

20